LATHAM & WATKINS LLP
885 Third Avenue
New York, NY 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Adam J. Goldberg
Shaun C. Lee

*Counsel to the Foreign Representative*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 15 |
| Thomas Cook Group plc, *et al.*,[1] | Case No. 19-12984 (MG) |
| Debtors in a Foreign Proceeding | Joint Administration Requested |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN NONMAIN PROCEEDINGS OR, IN THE ALTERNATIVE, FOREIGN MAIN PROCEEDINGS, SUPPLEMENTING "VOLUNTARY PETITION" DOCKET NO. 1, AND MOTION FOR RELATED RELIEF PURSUANT TO SECTIONS 105(A), 1507(A), 1509(B)(2)-(3), 1521(A), 1521(C), AND 1525(A) OF THE BANKRUPTCY CODE GIVING FULL FORCE AND EFFECT TO UK SCHEMES OF ARRANGEMENT

---

[1]    The Debtors in this and the UK Proceedings, together with the last four digits of each Debtor's company registration number, are as follows: Thomas Cook Group plc (1951); Thomas Cook Finance 2 plc (5715); Thomas Cook Group Treasury Limited (5598). The location of Thomas Cook Group plc's corporate headquarters is 200 Aldersgate, London, EC1A 4HD.  The service address for the Debtors is 200 Aldersgate, London, EC1A 4HD.

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................................3

BACKGROUND .........................................................................................................................7

     A.    The Foreign Representative ...........................................................................7
     B.    The Debtors and Their Corporate Group Structure ......................................7
     C.    The Business and History of the Debtors and the Group................................9
     D.    Summary of the Debtors' and Group's Capital Structure.....................11
     E.    The Proposed  Transaction................................................................12
     F.    Commencement of the UK Proceedings and Activity to Date ............14
     G.    Implementation of the Amendments................................................17
     H.    The Debtors' Connection to the United Kingdom................................32
     I.    The Debtors' Connections to the United States and the Need for Timely
         Chapter 15 Relief ............................................................................33

JURISDICTION AND VENUE ...............................................................................................34

RELIEF REQUESTED................................................................................................................35

BASES FOR RELIEF................................................................................................................37

     A.    The Court Should Grant Recognition of the UK Proceedings as Foreign
         Nonmain Proceedings, or in the Alternative, as Foreign Main Proceedings,
         and of the Petitioner as its Foreign Representative................................38

NOTICE......................................................................................................................................61

NO PRIOR REQUEST .............................................................................................................61

Dr. Peter Fankhauser (the "Petitioner"), duly appointed by the August 27, 2019 resolutions (the "Resolutions of Appointment") of the board of directors of Thomas Cook Group plc ("TCG"), a public company in England and Wales with registered number 06091951, Thomas Cook Group Treasury Limited ("TC Treasury"), a public company in England and Wales with registered number 06575598, and Thomas Cook Finance 2 plc ("TCF2"), a public company in England and Wales with registered number 10645715, and declared as authorized to act by the August 30, 2019 orders (the "Convening Court Orders")[2] of the Chancery Division (Business and Property Court) of the High Court of Justice of England and Wales (the "English Court") as the foreign representative of the voluntary schemes of arrangement (the "Schemes")[3] concerning the Debtors before the English Court (the "UK Proceedings"), acting in such capacity and by and through his undersigned counsel, respectfully submits this verified petition in furtherance of the voluntary petition for relief under chapter 15 of Title 11 of the United States Code (the "Bankruptcy Code") filed concurrently herewith (together herewith, the "Petition") for entry of an order (i) recognizing the UK Proceedings as foreign nonmain proceedings pursuant to sections 1515 and 1517 of the Bankruptcy Code, or, in the alternative if the court declines to recognize the UK Proceedings as foreign nonmain proceedings, as foreign main proceedings pursuant to sections 1515 and 1517 of the Bankruptcy Code together with waiver of the automatic stay pursuant to sections 105 and 362(d) of the Bankruptcy Code, and (ii) granting further permanent relief pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1521(a), 1521(c), and 1525(a) of the Bankruptcy Code in support of the Schemes, if such Schemes are duly approved by the requisite number of creditors holding

---

[2]    A true and correct copy each of the Convening Court Orders is attached to the Fankhauser Declaration as Exhibits A-1, A-2, and A-3.

[3]    A true and correct copy of the Scheme appears at Part 13 to the Explanatory Statement attached to the Fankhauser Declaration as Exhibit B.

the requisite amount of affected debt and sanctioned by the English Court, all in accordance with applicable English law.  In support of the Petition, the Petitioner has filed concurrently herewith and incorporated herein by reference the *Declaration of* Dr. Peter Fankhauser *Pursuant to 28 U.S.C. § 1746* (the "Fankhauser Declaration") and the *Declaration of John Houghton Pursuant to 28 U.S.C. § 1746* (the "Houghton Declaration"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      These chapter 15 cases (the "Chapter 15 Cases") are brought in the United States Bankruptcy Court for the Southern District of New York (the "Court") on behalf of the Debtors as ancillary proceedings for the foreign nonmain proceeding pending before the English Court.  TCG is organized under the laws of England and Wales and has an establishment in the United Kingdom.  TCG is the ultimate holding company of direct and indirect subsidiaries, which operate the Thomas Cook leisure travel business around the world ("Thomas Cook"). TCG was formed in 2007 following the merger between Thomas Cook AG and MyTravel Group plc. It was incorporated and registered in England and Wales as a public company limited by shares on February 8, 2007 under number 06091951 and the name Shakespeareco plc which was subsequently changed to its current name, Thomas Cook Group plc, on February 12, 2007.

2.      TCG's business and its principal activity is to act as the ultimate holding company of direct and indirect subsidiaries which form the "Group" and operate the Thomas Cook leisure travel business across the world.  The other members of the Group include TC Treasury, which was incorporated in England & Wales on April 24, 2008, and TCF2 (TCF2, together with TCG and TC Treasury, collectively, the "Debtors") [4] which was incorporated in England & Wales on

---

[4]      Concurrently with the filing of the Petition, the Petitioner filed the *Motion for Order Pursuant to Bankruptcy Rule 1015(b) Directing Joint Administration of Chapter 15 Cases*, pursuant to which the Petitioner seeks joint administration of the Debtors' chapter 15 cases for procedural purposes only.

March 1, 2017. Headquartered in London, the Group's key markets are the UK, Germany and Northern Europe.

3. On July 12, 2019 TCG announced that it was in discussions with its largest shareholder, Fosun Tourism Group ("Fosun") and the Group's core lending banks on the key commercial principles on which they would make a substantial new capital investment in the Group (the "Proposed Transaction"). Although the final terms are still being negotiated, the Proposed Transaction will provide the Group with sufficient liquidity to service its short-term cash obligations and its general corporate and working capital requirements provide TCG with a strengthened capital structure and balance sheet.

4. TCG and TCF2 are, respectively, the primary obligors of the 2022 Notes and 2023 Notes (each as defined herein, collectively, the "Notes") and TC Treasury is the primary obligor of the revolving credit facilities comprising the RCF (as defined herein). The Schemes propose to amend certain terms of the Notes Indentures and the RCF Agreement (in each case as defined herein) to ensure that, once the final terms of the Proposed Transaction are agreed, the Group will have the flexibility to pursue various options to implement the Proposed Transaction by the start of October 2019 (the "Scheme Amendments"). A summary of the Scheme Amendments and the steps required to implement the Proposed Transaction if the Schemes are sanctioned by the English Court are in each case set forth in greater detail herein.

5. The Schemes are comprised of the Parent Scheme,[5] the TCGTL Scheme and the TCF2 Scheme which are inter-conditional. The holders (the "Noteholders") of the Notes are the only creditors of the Group that will have their rights affected by the Parent Scheme and the TCF2

---

[5]    Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Explanatory Statement attached to the Fankhauser Declaration as Exhibit B.

Scheme, and the RCF Lenders (as defined herein) are the only creditors of the group that will have their rights affected by the TCGTL Scheme. Under applicable English law, at least seventy-five percent in amount and a majority in number of the creditors affected by each Scheme (who are present and voting in person or by proxy) at the relevant Scheme Meeting (as defined herein) must vote to approve the applicable Scheme in order for it to become binding on all Scheme Creditors.

6.      If approved by the applicable scheme creditors, the Schemes would facilitate the implementation of the Proposed Transaction. The specific terms of the Proposed Transaction are still being negotiated and the key terms announced in the TCG Announcement on August 28, 2019 (as defined in paragraph 26 below) would involve (a) substantially deleveraging the Group by converting approximately £1.67bn of RCF and Notes debt currently outstanding into new shares and a subordinated PIK note to be issued by the recapitalized Group in proportions still to be agreed; (b) providing the recapitalized Group with access to new money financing facilities in the amount of £900,000,000 (the "New Money"); and (c) reorganizing the structure of the Group, including legal, economic and financial separation of the Group Tour Operator's business from the Group Airline's business, and the transfer of at least a 75% interest in the Group Tour Operator and an interest of up to 25% in the Group Airline to Fosun.

7.      These Chapter 15 Cases serve a critical role in effectuating the Schemes, principally because recognition of the Schemes by this Court is a precondition to the implementation of the Proposed Transaction (or any alternative transaction) following the sanction of the Schemes. As set forth herein, granting the requested relief is appropriate because, among other reasons, the UK Proceedings, which are proceedings in respect of a United Kingdom scheme of arrangement, are foreign proceedings, each Debtor has an establishment in the United Kingdom, and the Foreign Representative is a proper "foreign representative." Moreover, the UK Proceedings grant

substantial due process rights to each Debtor's affected creditors that sufficiently protect their interests, and both the procedures applicable in the UK Proceedings and the substantive amendments under the Schemes are consistent with, and not manifestly contrary to, U.S. public policy.

8.      The Foreign Representative requests recognition of the Schemes as foreign nonmain proceedings based on the Debtors' establishments in the United Kingdom.  In the alternative, if the Court declines to grant recognition as foreign nonmain proceedings, the Foreign Representative requests that the Court grant recognition as foreign main proceedings, together with a general waiver of the automatic stay, based on the Debtors' center of main interests being located in the United Kingdom.  The Debtors may face adverse consequences from the imposition of the automatic stay in the United States.  For instance, if the UK Proceedings are recognized as foreign main proceedings (together with the application of the automatic stay within the territorial jurisdiction of the United States pursuant to section 1520(a)(1) of the Bankruptcy Code), such relief may be asserted to trigger certain events of default under the Indentures as well as subsequent cross-defaults under the Debtors' other debt instruments, including the RCF Agreement, and/or other agreements.  In addition, the automatic stay limited to the territorial jurisdiction of the United States may not provide the Debtors with meaningful protection because their assets and operations are primarily outside of the United States.  In these circumstances, the Foreign Representative requests that the Court exercise its discretion to grant recognition of the Schemes without application of the stay in furtherance of the purposes of chapter 15 of the Bankruptcy Code.

9.      Notwithstanding anything to the contrary in this Petition or any other document filed by the Foreign Representative in these Chapter 15 Cases, the Foreign Representative does not request the application of any stay or moratorium on payment of debts, creditor action, or

otherwise and reserves its rights to withdraw this Petition and seek dismissal of these Chapter 15 Cases in the event that the Court declines to grant either (a) recognition as foreign nonmain proceedings or (b) recognition as foreign main proceedings together with a general waiver of the automatic stay.

## **BACKGROUND**

### A.    **The Foreign Representative**

10.    Petitioner has been a director and Chief Executive Officer of TCG since November 2014.  In these capacities, the Petitioner has worked with the boards of directors of TCG and its subsidiaries in the development and implementation of strategy and high-level management decisions relating to the Group.  By virtue of this role, the Petitioner is fully aware of the Debtors and the Group's financial affairs, has been closely involved in the Debtors' efforts to restructure its liabilities, and has a thorough understanding of the amendments and the Proposed Transaction contemplated under the Schemes.  As noted above, the Petitioner was duly appointed foreign representative pursuant to the Resolution of Appointment.  Pursuant to the Convening Court Orders, the English Court declared that the Petitioner is the appointed foreign representative and authorized him to act in that capacity in respect of the UK Proceedings in this Chapter 15 Case and regarding the relief requested by this Petition.

### B.    **The Debtors and Their Corporate Group Structure**

11.    <u>TCG</u>.  TCG was formed in 2007 following the merger between Thomas Cook AG and MyTravel Group plc. It was incorporated and registered in England and Wales as a public company limited by shares on February 8, 2007 under number 06091951 and the name Shakespeareco plc which was subsequently changed on February 12, 2007 to its current name, Thomas Cook Group plc.  TCG has been listed on the Official List maintained by the Financial

Conduct Authority, and admitted to trading on the Main Market of the London Stock Exchange ("LSE") since June 19, 2007. As at August 19, 2019, approximately 32.3% of TCG's shares were held by institutional investors, 37.6% held by retail investors and 30.1% by other investors, including its largest shareholder, Fosun Tourism Group and its affiliates who together hold 18.07%.   TCG's business and its principal activity is to act as the ultimate holding company of direct and indirect subsidiaries which form the Group and operate the Thomas Cook leisure travel business across the world.   TCG's Board is comprised of 10 members, of whom 8 are non-executive directors, and 2 (including the Petitioner) are executives of TCG.

12.   TCF2.  TCF2 is a public limited company incorporated in England and Wales with registered number 10645715, whose registered office is at Westpoint, Peterborough Business Park, Lynch Wood, Peterborough PE2 6FZ. TCF2 is a member of the Group and its directors are Rebecca Symondson-Powell and Thomas Cook Group Management Services Limited.  TCF2 has no business operations and no assets, other than the inter-Group debts due from other members of the Group which resulted from the inter-Group loans of the proceeds of the 2023 Notes (as defined below). TCF2 is dependent upon the cash flow from its subsidiaries in the form of interest payments or other distributions or payments to meet its obligations, including under the 2023 Notes.

13.   TC Treasury.  TC Treasury is a private limited company incorporated in England and Wales with registered number 06575598, whose registered office is at Westpoint, Peterborough Business Park, Lynch Wood, Peterborough PE2 6FZ.  TC Treasury is a member of the Group and its directors are Christopher Corner and Thomas Cook Group Management Services Limited.

C.    **The Business and History of the Debtors and the Group**

14.    The Group is headquartered in London and comprises TCG's direct and indirect subsidiaries which operate the Thomas Cook business across the world. Thomas Cook is one of the prominent European brands in the leisure travel industry. Its key markets are the UK, Germany and Northern Europe. It has a history dating back to 1841.  The Group serves approximately 22 million customers each year. As at December 31, 2018, the Group had 21,263 thousand employees (including approximately 9,000 employees in the UK) operating from 16 countries and operated a combined fleet of over 100 aircraft through five entities holding air operator certificates in the UK, Germany (two entities), Denmark and Spain. The Group also has approximately 2,800 owned and franchised retail outlets (including 555 shops in the UK) and operates 199 own-brand hotels across the world.

*The Group's Business Segments*

15.    The Group is organized into the following three business segments organized according to the principal operating activities:

(a)    Group tour operator which comprises the Group's UK, Continental Europe and Northern Europe tour operators and Thomas Cook Money (the "Group Tour Operator");

(b)    Group airline which comprises the Group's UK, German, Northern Europe and Spanish airlines businesses (the "Group Airline"); and

(c)    Group corporate which comprises the Group's corporate functions as well as certain other businesses including Thomas Cook China ("Group Corporate").

16.    The Group Tour Operator.  The Group Tour Operator business offers a wide range of holiday options, including traditional packaged holidays, independent travel products and a selection of travel-related financial services for which it acts as an intermediary. The Group's largest product category is traditional pre-packaged holidays, where two or more components of

9

travel, such as charter flights (often using the Group's own airlines), hotels and transfers are bundled together and offered for sale as a single product. The Group's independent travel products encompass packaged holidays (where customers can tailor their holiday by bundling together individual holiday components to meet their personal requirements with regard to destination, duration, variety, quality and price), individual holiday components and scheduled tours. The Group aggregates the various components from a wide range of third-party suppliers. The Group sells these products directly to customers through its retail outlets, websites and call centres as well as on a business-to-business basis to third-party travel agents.  The Group Tour Operator accounts for approximately 60% of TCG's operating profit.

17.    <u>The Group Airline</u>.  The Group Airline business consists of five entities holding air operator certificates in the UK, Germany (two entities), Denmark and Spain. Group Airline operates under two brands: Condor in Germany and Thomas Cook Airlines elsewhere. Group Airline offers direct flights to holiday destinations throughout Europe, the Middle East and North Africa region and long-haul destinations such as the Caribbean and North America from departure cities in the UK, Germany and Northern Europe. It supplies seats to the Group Tour Operator, third party tour operators and seat-only customers. Group Airline also provides certain ancillary products such as airline meals and seat selection and extra luggage. In the financial year ending September 30, 2018 ("<u>FY18</u>"), Group Airline served around 20 million customers.  The Group Airline accounts for approximately 40% of TCG's operating profit.

*The Group's Business Model*

18.    The Group operates different business models for its tour operations within each of its markets, depending on the degree of integration among its Group Tour Operator and Group Airline businesses and distribution channels.  In Northern Europe, the Group's business model is

10

that of a vertically integrated Group Tour Operator, based on the use of its Group Airline business and controlled distribution of products. In the UK and Germany, the Group Tour Operator has a more end-to-end model, where it both supplies the components such as seats and hotel beds, as well as sources components from third-parties to create a package solution.  In markets where the Group does not operate its own airline, all air capacity requirements are sourced from third parties, and there is generally a lower level of controlled distribution than in our other markets.

### D.    Summary of the Debtors' and Group's Capital Structure

*The Notes*

19.    <u>The 2022 Notes</u>.  TCG is the issuer of the €750 million aggregate principal amount of 6.25% guaranteed senior unsecured notes due to mature on June 15, 2022 (the "<u>2022 Notes</u>") pursuant to an indenture dated December 8, 2016, between TCG, Wilmington Trust, National Association as trustee for the holders (the "<u>2022 Notes Trustee</u>"), Elavon Financial Services DAC, UK Branch, as principal paying agent and Elavon Financial Services DAC, as registrar and transfer agent (the "<u>2022 Indenture</u>").

20.    <u>2023 Notes</u>.  TCF2 is the issuer of the €400 million aggregate principal amount of 3.875% guaranteed senior unsecured notes due to mature on July 15, 2023 (the "<u>2023 Notes</u>") pursuant to an indenture dated December 7, 2017 between, amongst others, TCF2, Wilmington Trust as trustee for the holders (the "<u>2023 Notes Trustee</u>" and together with the 2022 Notes Trustee, National Association the "<u>Notes Trustee</u>") Elavon Financial Services DAC, UK Branch, as principal paying agent and Elavon Financial Services DAC, as registrar and transfer agent (the "<u>2023 Indenture</u>", and together with the 2022 Notes Indenture, the "<u>Indentures</u>").

*Revolving Credit Facility*

21.    On November 21, 2017, TCG and other Group companies entered into an English law governed revolving facilities agreement with the Original Lenders (as defined therein) and

Lloyds Bank plc (the "RCF Agent") as facility agent (the "RCF Agreement"), with £650 million in revolving commitments (the "RCF" and the lenders thereunder, the "RCF Lenders") and ancillary facilities ("Ancillary Facilities"), and £200 million and €28 million in bonding commitments (the "Committed Bonding Lines").

22.    Interest is payable on loans under the RCF Agreement at a floating rate equal to the London Inter-bank Offered Rate or, in relation to any loan drawn in euro, Euro Interbank Offered Rate, plus the applicable margin and mandatory costs, if any. The initial margin that applied to the RCF Agreement was 3.0833% per annum from November 21, 2017 until February 27, 2018, and thereafter margin has been determined by the corporate family rating of TCG, being 3.50% for a rating of B3/B−/B- and below, 3.25% for a rating of B2/B/B, 3.00% for a rating of B1/B+/B+, 2.75% for a rating of Ba3/BB−/BB–, and 2.50% for a rating of Ba2/BB/BB and above.

23.    The RCF Agreement matures on November 21, 2022 or, to the extent that the 2022 Notes or 2023 Notes (or any issuance replacing the same) are still outstanding, three months prior to the final maturity date of the 2022 Notes or 2023 Notes (or any replacement notes), if earlier.

24.    At the date hereof, the RCF is fully drawn and £211 million of the Committed Bonding Lines are utilized.

*Guarantees, Security and Intercreditor Arrangements*.

25.    The 2022 Notes and the 2023 Notes (together, the "Notes") and the RCF Agreement are all unsecured *pari passu* obligations and they all benefit from common guarantors across the Group (the "Joint Obligors"), as listed in Schedule 1 to the Fankhauser Declaration.  There are no intercreditor agreements in place in respect of the Group's bond and bank debt.

E.    **The Proposed  Transaction**

26.    On August 28, 2019, TCG announced (the "TCG Announcement") that TCG, Fosun, the Group's core lending banks and a majority of the Noteholders have, subject to certain

matters referred to in the TCG Announcement, reached substantial agreement regarding the key commercial terms for the Proposed Transaction which are as follows: (a) substantially deleverage the Group by releasing certain claims of the Noteholders and the Cash RCF Lenders in relation to approximately £1.67bn of currently outstanding RCF and Notes debt in consideration for at least 15% of the equity and at least a £81m subordinated PIK note to be issued by the recapitalized Group (the "Recapitalized Group") pro rata to Scheme Creditors (the "Debt-for-Equity Swap"); (b) provide the Recapitalized Group with access to new money financing facilities in the amount of £900 million (the "New Money"); and (c) reorganize the structure of the Group, including legal, economic and financial separation of the Group Tour Operator's business from the Group Airline's business, and, at Fosun's option, the transfer of 75% of the Group Tour Operator and up to 25% of the Group Airline to Fosun.

27.    In connection with the foregoing, the Schemes seek to amend certain terms of the Indentures and the RCF Agreement to ensure that, once the final terms of the Proposed Transaction (or any other transaction) are agreed, the Group will have the flexibility to pursue various options to implement the Proposed Transaction by October 2019 (the "Scheme Amendments").

28.    The Scheme Amendments will be made directly through amendments to the Indentures pursuant to supplemental indentures (the "Supplemental Indentures") and the RCF Agreement pursuant to an amendment agreement (the "RCF Amendment Agreement") as well as pursuant to a common terms agreement (the "Common Terms Agreement"). The Scheme Amendments will include :

(a)    lowering or changing the voting threshold (and voting mechanics) for changes to material or other terms under the Notes including, without limitation, the release of guarantees and principal claims, amending the Notes to provide for the mandatory exchange or conversion of the Notes in whole or in part into equity and/or debt securities or other consideration of

a Scheme Company, its affiliates or any entity or entities which are not affiliates of the Scheme Companies;

(b) amending certain covenants and events of default to facilitate implementation of the Proposed Transaction;

(c) changing the percentage of Noteholders that is required to call an event of default under the Indentures, accelerate the Notes or rescind an acceleration or waive a default or event of default; and

(d) changing the consent requirements and voting thresholds for certain actions and amending or waiving certain provisions under the RCF Agreement.

29.    The Schemes do not themselves release any principal or guarantee claims of any Scheme Creditors, nor do they implement the conversion or exchange into equity and/or debt of the Notes Scheme Claims, the RCF debt or the RCF Bonding Lines. Any such release, conversion, exchange or similar transaction is expected to be implemented following sanction of the Schemes utilizing the Scheme Amendments.

**F.    Commencement of the UK Proceedings and Activity to Date**

30.    The Debtors appeared before the English Court on August 30, 2019 requesting an order to convene meetings of the Scheme Creditors (the "Scheme Meeting").  Notice of the application was delivered to the Scheme Creditors in accordance with English law by means of the Practice Statement Letter.  The Practice Statement Letter gave notice to the Scheme Creditors that the Debtors were intending to apply to the English Court, at a court hearing (the "Scheme Convening Hearing") to be held on August 30, 2019, for orders (*i.e.*, the Convening Court Orders) granting the Debtors certain directions in relation to the Schemes, including permission to convene the Scheme Meetings for the purpose of considering and, subject to the outcome of voting, approving the Schemes.

31.    On August 30, 2019, the English Court held the Scheme Convening Hearing and issued the Convening Court Orders.  Among other things, the Convening Court Orders set the

Scheme Meetings to start at 9:00 a.m. (London time) on September 18, 2019,[6] at the offices of

Latham & Watkins LLP, 99 Bishopsgate, London EC2M 3XF, UK and ordered that a package of

documents (an "Information Package") (i) be published on the Scheme Website and that notice be

given to the Noteholders and the RCF Lenders via the Clearing Systems and GLAS (the

information agent under the Schemes) that the Information Package is available to be downloaded

and viewed and (ii) be made available for inspection during normal business hours at the offices

of GLAS, 45 Ludgate Hill, London EC4M 7JU.  The Information Package includes, among other

things:

> (i)    A detailed explanatory statement (the "Explanatory Statement")[7] as
> required to be provided under English law—*i.e.*, the functional equivalent
> of a disclosure statement required under section 1125 of the Bankruptcy
> Code—describing, among other things, the Schemes, the effect and risks of
> the Schemes, any material interests of the managing directors of the Debtors
> and the effect which the Schemes have on such interests, the Scheme voting
> and approval process, the other steps of the Proposed Recapitalization

---

[6]    Subsequently, pursuant to applications by the Debtors to vary the convening orders, the English Court
ordered that the Scheme Meetings instead be convened on September 27, 2019.

[7]    A true and correct copy of the Explanatory Statement is attached to the Fankhauser Declaration as Exhibit
B.

(including a summary of the order sought by this Petition) and information about the Debtors and their business and that of the Group;

(ii)    the Schemes;[8]

(iii)   a form of notice of the Scheme Meeting (the "Notice of the Scheme Meeting");[9] and

(iv)    voting instructions.[10]

32.    The English Court, in the Convening Court Orders, declared that the Petitioner was "appointed foreign representative authorised . . . to act as a foreign representative . . . in any Chapter 15 proceedings in the United States Bankruptcy Court". *See* Fankhauser Declaration, Exhibit A-1 at ¶ 21, Exhibit A-2 at ¶ 21, and Exhibit A-3 at ¶ 22.

33.    The Information Package has been provided to the Noteholders and the RCF Lenders on the Scheme Website together with notification to the Noteholders through the Clearing Systems and to the RCF Lenders through GLAS.  The Clearing Systems, in accordance with their usual procedures, have forwarded or will forward a notice confirming their receipt of such materials directly to their participants and clients, being the Account Holders for whom they hold details, and informing the Account Holders of the means by which they can download or otherwise obtain copies of the materials.

34.    The Account Holders have been liaising with the Noteholders and/or any intermediaries who themselves hold an interest in the Notes on behalf of Noteholders, and will collate, through the procedures established by the Clearing Systems for the purposes of the relevant Schemes, individual voting instructions on behalf of the Noteholders.  The votes can then be

---

[8]     The Scheme is set forth in Part 13 of the Explanatory Statement.  Fankhauser Declaration, Exhibit B.

[9]     The Notice of the Scheme Meeting is set forth in Appendix 4 of the Explanatory Statement.  Fankhauser Declaration, Exhibit B.

[10]    Voting instructions are set forth in Appendix 2 of the Explanatory Statement.  A form of account holder letter (the "Account Holder Letter") to be completed by Noteholders and sent to depositary account holders (the "Account Holders") is set forth in Appendix 6 of the Explanatory Statement.  Fankhauser Declaration, Exhibit B.

lodged by the Account Holder with the relevant Clearing System, together with certification of

holdings of each of the Noteholders as at 11:59 a.m. (London time) on September 26, 2019, which

has been set as the record date when all claims in respect of the Schemes will be determined, and,

in turn, lodged with the Debtors via the Information Agent such that they are received by the

Information Agent before 11:59 a.m. (London time) on September 26, 2019, which has been set

as the voting instruction deadline (the "Voting Instruction Deadline"). The RCF Lenders will be

entitled to attend the relevant Scheme Meetings in person or by proxy by submitting a validly

completed proxy form to the Information Agent by the Voting Instruction Deadline.

35.    It is anticipated that a hearing to consider sanctioning the Scheme, if it obtains

requisite approval from the Noteholders and the RCF Lenders at the Scheme Meetings, will occur

on September 30, 2019 (the "Sanction Hearing").  During such hearing, the Debtors anticipate the

English Court will enter an order sanctioning the Scheme (the "Scheme Sanction Order").

**G.    Implementation of the Amendments**

36.    It is the Petitioner's understanding that all Noteholders will be treated the same and

that Noteholders located in the United States are not subject to undue inconvenience or prejudice.

It is also the Petitioner's understanding that all Cash RCF Lenders[11] and all Contingent RCF

Lenders[12] will be treated the same and that Cash RCF Lenders and Contingent RCF Lenders

located in the United States are not subject to undue inconvenience or prejudice.

---

[11]    "Cash RCF Lenders" are the Lenders and Ancillary Lenders (each as defined in the RCF Agreement) in
respect of their RCF cash commitments including, for the avoidance of doubt, any Lenders and Ancillary Lenders
under any Ancillary Facility (as defined in the RCF Agreement) which is not a bonding facility ("Ancillary Bonding
Facility").

[12]    "Contingent RCF Lenders" are the Lenders and Ancillary Lenders (each as defined in the RCF Agreement)
in respect of their RCF Contingent Commitments. The "RCF Contingent Commitments" comprise (i) any Ancillary
Commitments (as defined in the RCF Agreement) in respect of the RCF Bonding Lines and/or (ii) any Bonding
Facility Commitments (as defined in the RCF Agreement). The "RCF Bonding Lines" means the Bonding Facility (as
defined in the RCF Agreement) and each Ancillary Bonding Facility.

37. The Schemes seek to amend certain terms of the Indentures and the RCF Agreement (the "Scheme Amendments") to ensure that, once the final terms of the Proposed Transaction (or any other transaction) are agreed, the Group will have the flexibility to pursue various options to implement the Proposed Transaction in early October 2019.

38. The Scheme Amendments will be made will be made directly through amendments to the Indentures pursuant to supplemental indentures (the "Supplemental Indentures") and the RCF Agreement pursuant to an amendment agreement (the "RCF Amendment Agreement") as well as pursuant to a common terms agreement (the "Common Terms Agreement"). The Scheme Amendments will include :

(a) lowering or changing the voting threshold (and voting mechanics) for changes to material or other terms under the Notes including, without limitation, the release of guarantees and principal claims, amending the Notes to provide for the mandatory exchange or conversion of the Notes in whole or in part into equity and/or debt securities or other consideration of a Scheme Company, its affiliates or any entity or entities which are not affiliates of the Scheme Companies;

(b) amending certain covenants and events of default to facilitate implementation of the Proposed Transaction;

(c) changing the percentage of Noteholders that is required to call an event of default under the Indentures, accelerate the Notes or rescind an acceleration or waive a default or event of default; and

(d) changing the consent requirements and voting thresholds for certain actions and amending or waiving certain provisions under the RCF Agreement.

39.    The Schemes will authorize TCG to sign, on behalf of the Scheme Creditors, certain documents pursuant to which the terms of the Indentures and the RCF Agreement will be amended.

40.    The Schemes do not themselves release any principal or guarantee claims of any Scheme Creditors, nor do they implement the conversion or exchange into equity and/or debt of the Notes Scheme Claims, the RCF debt or the RCF Bonding Lines. Any such release, conversion, exchange or similar transaction is expected to be implemented following sanction of the Schemes utilising the Scheme Amendments.

41.    Absent the Schemes, there is significant uncertainty as to whether the Group would achieve the requisite level of creditor consent to implement the Proposed Transaction (or any alternative transaction) which would put the Scheme Companies and other companies in the Group at a serious risk of insolvency. In these circumstances, the Group considers that, absent the Schemes, the likely alternative is an insolvency of TCG, TCF2, TC Treasury and other Group companies.

42.    <u>Amendments applicable to the RCF Agreement.</u> The TC Treasury Scheme  will change the following RCF Lender consent requirements and voting thresholds under the RCF Agreement in the following manner pursuant to the terms of the RCF Amendment Agreement and the Common Terms Agreement (as applicable) (capitalized terms used in this paragraph 41, which are not otherwise defined in this Petition, have the meanings given to them in the RCF Amendment Agreement):

| Matter requiring RCF Lender consent for an amendment or waiver under the RCF Agreement | Existing voting threshold (absent the RCF Scheme) | Voting threshold proposed pursuant to the RCF Scheme |
|---|---|---|
| Any amendment, waiver or release of any liabilities and obligations of any member of the Group under the Finance | All RCF Lenders | All Contingent RCF Lenders. |

| | | |
|---|---|---|
| Documents (present or future, actual or contingent and whether incurred solely or jointly) to any Contingent RCF Lender. | | |
| Any amendment, waiver or release of any liabilities and obligations of any member of the Group under the Finance Documents (present or future, actual or contingent and whether incurred solely or jointly) to any Cash RCF Lender. | All RCF Lenders | 75 per cent. of Cash RCF Lenders, subject to the consent request process and conditions set out in the Common Terms Agreement, as more fully described in paragraphs 44 to 53 below. |
| Any amendment or waiver to the following clauses in order to implement the proposed recapitalization transaction:<br><br>(a)    clause 33 (Sharing among the Finance Parties) which has the effect of changing or which relates to a reduction in the Margin or a reduction in the amount of any payment of principal, interest, fees or commission payable;<br><br>(b)    clause 33.6 (Ancillary Lenders and Issuers); or<br><br>(c)    clause 34 (Lenders: Loss Share). | For (a) and (c) – all RCF Lenders<br><br>For (b) – depending on the impact of the amendment or waiver, either (i) Majority Lenders, each relevant Ancillary Lender and each relevant Issuer or (ii) all RCF Lenders. | 80 per cent. of Contingent RCF Lenders and 80 per cent. of Cash RCF Lenders. No such amendment or waiver that would result in or have the effect of Swiss Re International SE, Niederlassung Deutschland becoming subject to clause 34 (Lenders: Loss Share) (as amended from time to time) shall be made without its prior written consent. Any such amendment which:<br><br>(i) imposes an onerous obligation (including an obligation to make a payment or accept a liability to make a payment) on a Finance Party; or<br><br>(ii) has the effect of not providing each of the Cash Only Lenders with similar and proportional rights to those which are afforded to each of the other Cash Only Lenders, may not be effected without the consent of that Finance Party. |

| Any amendment or waiver that has the effect of changing or which relates to clause 12.1 (Change of control). | All RCF Lenders | If the Change of Control occurs as a direct result of the proposed recapitalization transaction, 75 per cent. of RCF Lenders. In any other case, all RCF Lenders. |
|---|---|---|

43.    The TC Treasury will also provide (pursuant to the terms of the RCF Amendment Agreement) for certain other provisions contained in the RCF Agreement to be amended or waived, solely in connection with and incidental to, and solely to the extent required to give effect to, the exercise of the express powers of the Common Terms Agent under the Common Terms Agreement:

(a)    clause 41.2(a)(iii) (Amendments and Waivers), such that any release of a repayment obligation in respect of the payment of principal, interest, fee or commission under the RCF Agreement and any Ancillary Document may be released pursuant to the Common Terms Agreement;

(b)    clause 41.2(a)(iv) (Amendments and Waivers), clause 33 (Sharing among the Finance Parties) and clause 35.6(a) and (b) (Partial payments), only to the extent it is applicable to the receipt of the Transaction Consideration (as contemplated in the Common Terms Agreement) in exchange for a release of a repayment obligation or a reduction or cancellation of any Commitment or Ancillary Commitment;

(c)    clause 41.2(a)(v) (Amendments and Waivers), to permit the cancellation of any Commitment or Ancillary Commitment in the manner provided for in the Common Terms Agreement (to the extent such cancellation does not occur rateably);

(d)     clause 41.2(a)(vi) (Amendments and Waivers), such that any Guarantee Liabilities in respect of the RCF Agreement and any Ancillary Document may be released pursuant to the Common Terms Agreement;

(e)     clause 41.2(a)(ix) (Amendments and Waivers), only to the extent that the release referred to in paragraph (d) above has the effect of changing or relates to the nature and scope of the guarantee and indemnity granted under clause 23 (Guarantee and Indemnity) of the RCF Agreement; and

(f)     clause 41.2(c) (Amendments and Waivers), such that the relevant time period in relation to a RCF Consent Request will be five Business Days (as defined in the Common Terms Agreement) instead of 15 Business Days (as defined in the RCF Agreement).

44.     <u>Amendments applicable to the Notes.</u> Pursuant to the Supplemental Indentures, the Notes Schemes will give effect to the following amendments to the Notes:

(a)     Introduce a definition of "Qualified Majority Noteholders" as defined in the Common Terms Agreement, meaning Noteholders, which have at the end of the relevant date voted in the affirmative to the request in question and represent not less than 75% of the Participating Notes on such date, where "Participating Notes" means on any date, all Notes for which consent or voting instructions have been validly delivered and not revoked at the end of business on such date for both issues of Notes; provided that all Noteholders that have delivered a valid consent or voting instruction and have not revoked such consent or voting instruction by the end of such date

represent at least 50% of the principal amount of Notes outstanding (voting as a single class);

(b)  Allow for the consent of the Common Terms Agent (acting on the instructions or with the consent of the Qualified Majority Noteholders in accordance with the Common Terms Agreement), subject to satisfaction of certain conditions set out in the Common Terms Agreement, to an amendment, supplement or waiver which would otherwise have required the consent of holders of not less than a majority of the aggregate principal amount of the then outstanding Notes under the relevant Indenture;

(c)  Allow for the consent of the Common Terms Agent (acting on the instructions or with the consent of the Qualified Majority Noteholders in accordance with the Common Terms Agreement), subject to satisfaction of certain conditions set out in the Common Terms Agreement, to an amendment, supplement or waiver which would otherwise have required the consent of holders of at least 90% of the aggregate principal amount of the then outstanding Notes under the relevant Indenture;

(d)  Allow, without the consent of any Noteholder, the Issuer, any Guarantor and the Notes Trustee to amend the Indentures or the Notes to (i) add any Notes guarantees, add security, or confirm the release, termination or discharge of any guarantee or lien with respect to or securing the Notes when permitted under the Common Terms Agreement (in addition to the existing provision to add any Notes guarantees, add security, or confirm the release, termination or discharge of any guarantee or lien with respect to or

securing the Notes when permitted under the relevant Indenture), and (ii) to evidence and provide the acceptance of the appointment of a successor trustee under the Common Terms Agreement (in addition to the existing provision to evidence and provide the acceptance of the appointment of a successor trustee under the relevant Indenture);

(e)    Providing that, notwithstanding anything else to the contrary, the Notes and the Indentures may be amended with the consent of the Common Terms Agent (acting on the instructions or with the consent of the Qualified Majority Noteholders in accordance with the Common Terms Agreement) to provide for the mandatory exchange or conversion of the Notes, in whole or in part, into equity and/or debt securities or other consideration of the Issuer, any affiliate of the Issuer or any entity or entities that are not affiliates of the Issuer, in accordance with the Common Terms Agreement;

(f)    Providing under Section 11.05 (Releases) that a Guarantor may be released automatically and unconditionally from all obligations under its guarantee of the Notes pursuant to the provisions of the Common Terms Agreement, and that encumbrances or restrictions on the Issuer or any Restricted Subsidiary in connection with the Common Terms Agreement are permitted pursuant to Section 4.08 (Dividend or Other Payment Restrictions Affecting Restricted Subsidiaries);

(g)    The deletion of Section 6.07 and Section 9.02, fourth paragraph, clause (6) of each Indenture and any and all references thereto, obligations thereunder and references to any events of default related thereto;

(h)     Inclusion of a new definition of "Permitted Transaction" meaning any act, event or transaction or any failure to act pursuant to or in connection with transactions or actions or failures to act conducted with the approval of the Common Terms Agent (acting on the instructions or with the consent of the Qualified Majority Noteholders in accordance with the Common Terms Agreement);

(i)     Providing that a Permitted Transaction is permitted under Article 4 and Article 5 of the Indentures, and amending certain covenants and/or the inclusion of carve-outs to those covenants in relation to the implementation of a Permitted Transaction, including carving out a Permitted Transaction from Section 4.10 (Asset Sales), Section 4.16 (Payments for Consent) (applicable to the 2022 Notes Indenture only) and Section 5.01 (Merger, Consolidation or Sale of Assets), and providing pursuant to Section 4.14 (Offer to Repurchase Upon Change of Control) that the relevant issuer will not be required to make a Change of Control Offer upon a Change of Control in connection with a Permitted Transaction);

(j)     Providing that a Permitted Transaction shall not be or cause a default or event of default under Article 6 of the Indentures;

(k)     (i) Amending the event of default provided for in Section 6.01(a)(8) of the 2022 Notes Indenture and Section 6.01(a)(6) of the 2023 Notes Indenture to provide that any relevant order or decree under any Bankruptcy Law (as defined in the Indentures) remain unstayed and in effect for 14 days (reduced from 60 days) before giving rise to an event of default, (ii) until

November 1, 2019, increasing the voting or instruction threshold in relation to the acceleration of claims under the Indentures to require Holders of at least 45% in principal amount of the outstanding Notes (increased from Holders of at least 25% before effectiveness of the Supplemental Indentures, and reverting to Holders of at least 25% following November 1, 2019) if an event of default occurs and is continuing (other than an event of default set forth in (x) in the case of the 2022 Notes Indenture, clauses (7) (other than clause (7)(E)) or (8) of Section 6.01(a)) or (y) in the case of the 2023 Notes Indenture, other than an event of default set forth in clauses (5) (other than clause (5)(E)) or (6) of Section 6.01(a)), (iii) to provide that an event of default under (x) clause (7)(E) of Section 6.01(a) of the 2022 Notes Indenture and (y) clause (5)(E) of Section 6.01(a) of the 2023 Notes Indenture will not cause the immediate acceleration of the Notes without any declaration on the part of the relevant Notes Trustee or any Holders and (iv) providing pursuant to Section 6.05(a)(5) that no Holder may pursue any remedy with respect to the relevant Indenture or Notes unless the Holders of a majority in aggregate principal amount of the then outstanding Notes or the Common Terms Agent (acting on the instructions or with the consent of the Qualified Majority Noteholders in accordance with the Common Terms Agreement) have given the Notes Trustee a direction inconsistent with such request within the relevant 60-day period;

(l)     Providing that, in addition to the Holders of a majority in aggregate principal amount of the then outstanding Notes, the Common Terms Agent

(acting on the instructions or with the consent of the Qualified Majority Noteholders in accordance with the Common Terms Agreement) may also (i) waive any past default and its consequences (except a continuing payment default on any Note held by a non-consenting Holder which may be waived only as provided in Section 9.02), and rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration, (ii) rescind an acceleration if the rescission would not conflict with any judgment or decree and if all existing events of default (except payment default that has become due solely because of such acceleration) have been cured or waived, and (iii) shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Notes Trustee or of exercising any trust or power conferred on the Notes Trustee, provided the Notes Trustee, however, may refuse to follow any direction that conflicts with law or the relevant Indenture or that the Notes Trustee determines is unduly prejudicial to the rights of any other Holder (provided, however, that the Notes Trustee shall not be obligated to determine whether any action or inaction is prejudicial to any Holder) or that would involve the Notes Trustee in personal liability;

(m)     Authorize the relevant issuer and its subsidiaries and the relevant Notes Trustee to enter into the Common Terms Agreement and provide that Holders are deemed by their acceptance of any Note to (i) appoint and authorize the relevant Notes Trustee and the Common Terms Agent to give effect to the Common Terms Agreement, (ii) agree to be bound by the

Common Terms Agreement, (iii) irrevocably appoint the relevant Notes Trustee and the Common Terms Agent to act on its behalf to enter into and comply with the Common Terms Agreement and (iv) irrevocably instruct the Notes Trustee to execute any such supplemental indenture as may be instructed by the Common Terms Agent in accordance with the Common Terms Agreement;

(n)     Provide that the Common Terms Agreement may be amended in accordance with its terms, and that the relevant issuer is entitled to direct the Notes Trustee to enter into any amendment or waiver of any provision of the Indentures with the consent of the Common Terms Agent (acting on the instructions or with the consent of the Qualified Majority Noteholders in accordance with the Common Terms Agreement), unless the relevant issuer is entitled to request such amendment or waiver without the consent of Holders in accordance with the provisions set forth in Section 9 of the relevant Indenture;

(o)     In connection with an amendment or waiver, deleting from Section 9.03 a Noteholder's ability to revoke any such consent by written notice to the Notes Trustee or the Issuer; and

(p)     Providing, notwithstanding anything else in the Indentures to the contrary, that the relevant Indenture is qualified in its entirety (and expressly in respect of Section 7.02(j), concerning inconsistent or conflicting requests and indemnity from two or more groups of Holders, each representing less than a majority in aggregate principal amount of the Notes then

outstanding)) and is subject in all respects to the terms of the Common

Terms Agreement, and that in the event of any conflict between the relevant

Indenture or Notes on the one hand and the Common Terms Agreement on

the other hand, the Common Terms Agreement shall apply.

45.    <u>Overview of the Common Terms Agreement</u>. The Common Terms Agreement sets

out the mechanism for the Scheme Companies to, once the Proposed Transaction has been agreed

and the Lock-up Agreement is signed (or the conditions in respect of these steps have been waived

in accordance with the Common Terms Agreement), utilize the amended voting thresholds

implemented by the Supplemental Indentures and the RCF Amendment Agreement (as applicable)

to seek the consent of (a) Noteholders to the Proposed Transaction (other than those entities from

whom it would not be lawful to solicit consent) and (b) Cash RCF Lenders to the release of their

claims in exchange for the relevant debt and equity to be issued in as part of the Proposed

Transaction.

*Noteholders*

46.    With respect to the Noteholders, the Common Terms Agreement requires that the

Scheme Companies prepare a consent solicitation document (the "<u>Consent Solicitation</u>

<u>Document</u>"), which shall contain a minimum standard of disclosure in relation to the proposed

recapitalization transaction (including, without limitation, the parties involved and the role of such

parties in relation to, and the extent to which they have agreed to, the proposed recapitalization

transaction, material conditions to implementation as well as all relevant risk factors in relation to

the proposed recapitalization transaction). It shall also set out the amendments and consents sought

in relation to the Indentures, and shall append copies of documents necessary or desirable to

implement the proposed recapitalization transaction.

47.    The amendments and consents sought in relation to the Indentures may include amendments necessary or desirable to implement the Proposed Transaction including, without limitation, the release of all or any part or the principal debt or guarantee claims under the Notes. Such amendments may also, with respect to the Notes, amend the Indentures such that the Notes would, upon delivery of a notice by a third party, be automatically and mandatorily converted (in whole or in part) into the restructured equity interests and/or debt instrument referred to above. Any release, exchange or conversion is intended to occur simultaneously as between the Cash RCF Lenders and the Noteholders.

48.    The consents and amendments contemplated by the Consent Solicitation Document will require approval by the Qualified Majority Noteholders (as defined in paragraph 9.8(a) above). Once consents have been obtained from the Qualified Majority Noteholders to the consent solicitation, and provided consents to the RCF Consent Request have also been obtained from the Majority Cash Lenders and the Chapter 15 Order has been granted and is not subject to a pending appeal (or the conditions in respect of these steps have been waived in accordance with the Common Terms Agreement), each of the Notes Trustees and the Common Terms Agent is authorized to sign relevant documents, and the Common Terms Agent is authorized to give relevant instructions to the Notes Trustees, to implement the proposed recapitalization transaction on the Noteholders' behalf.

*Cash RCF Lenders*

49.    With respect to the Cash RCF Lenders, the Common Terms Agreement requires that the Scheme Companies prepare a consent solicitation in respect of the RCF cash Commitments (the "RCF Consent Request Document"), which shall contain the same minimum standard of disclosure outlined above with respect to the Consent Solicitation Document.

50.     The releases contemplated by the RCF Consent Request Document will require approval by the Majority Cash Lenders (being RCF Lenders holding 75 per cent. or more of the RCF Cash Commitments at that time) subject to a five Business Day "snooze" provision. Once the approval of the Majority Cash Lenders has been obtained, and provided consents to the consent solicitation have also been obtained from the Qualified Majority Noteholders and the Chapter 15 Order has been granted and is not subject to a pending appeal (or the conditions in respect of these steps have been waived in accordance with the Common Terms Agreement), the Common Terms Agent is authorized to effect the relevant releases in accordance with the terms of the RCF Consent Request Document.

*Terms applicable to Noteholders and Cash RCF Lenders*

51.     The Common Terms Agreement also requires that the Consent Solicitation Document and RCF Consent Request Document each contain confirmation by the Company that the proposed recapitalization transaction, if implemented, would satisfy certain minimum conditions, including, without limitation, that any consideration to be received by the relevant Cash RCF Lenders and Noteholders in connection with the releases contemplated by the Consent Solicitation Document and the RCF Consent Request Document will comprise (in aggregate) of at least 15% of any restructured equity interests following completion of the Proposed Transaction and a subordinated debt instrument issued by the Recapitalized Group equal to at least £81,000,000.

52.     In addition, the Consent Solicitation Document and RCF Consent Request Document will also confirm that RCF Lenders and qualifying Noteholders will be invited to participate in at least their pro rata share (as calculated on the basis set out in the Common Terms

Agreement) in any new money financing to be provided by existing creditors of the Group in connection with the Proposed Transaction.

53.    The Common Terms Agreement also contains provisions whereby the Common Terms Agent is appointed and authorized to perform its functions thereunder, and is indemnified by certain members of the Group in connection with the performance of its functions under the Common Terms Agreement. It also contains provisions regulating the consent thresholds required to amend or waive provisions of the Common Terms Agreement itself.

54.    It is the Petitioner's understanding that if the Schemes are not given effect in the United States and the Proposed Transaction is not implemented, there is a risk that dissident Noteholders or RCF Lenders could bring proceedings in the United States against the Debtor, the Joint Obligors, and/or other parties protected by the Schemes.  The Petitioner also believes that, in the absence of recognition by this Court of the Schemes, the continued uncertainty and threat of adverse action by dissident Noteholders or Lenders intent on disrupting the Proposed Transaction to extract financial concessions will be harmful to the Debtors and their creditors.  For this reason, the Debtors seek chapter 15 recognition of the Schemes.

**H.    The Debtors' Connection to the United Kingdom**

55.    The Petitioner has been informed that the English Court must find that the Schemes are likely to be recognized and enforced in the other jurisdictions in which the Debtors have assets. Both center of main interests and an establishment in the United Kingdom also assist in achieving recognition of a scheme in other jurisdictions, including the United States, as either "foreign main proceedings" or "foreign nonmain proceedings."

56.    Each of the Debtors is organized, domiciled, and/or operated in the United Kingdom as set forth below.

(a) <u>TCG</u>: TCG was incorporated and registered in England and Wales as a public company limited by shares on February 8, 2007. TCG maintains an office in London ("<u>London Office</u>"). All of TCG's statutory books, records, and corporate documents are stored at its London office. TCG pays taxes in the United Kingdom. Substantially all of TCG's operations take place at its offices in the United Kingdom.

(b) <u>TCF2</u>: TCF2 is a public limited company incorporated in England and Wales, whose registered office in Peterborough (the "<u>Peterborough Office</u>"). All of TCF2's statutory books, records, and corporate documents are stored at the Peterborough Office. TCF2 pays taxes in the United Kingdom. Substantially all of TCF2's limited operations take place at its offices in the United Kingdom, and substantially no operations take place outside of the United Kingdom.

(c) <u>TC Treasury</u>: TC Treasury is a private limited company incorporated in England and Wales, whose registered office is the Peterborough Office. All of TC Treasury's statutory books, records, and corporate documents are stored at the Peterborough Office. TC Treasury pays taxes in the United Kingdom. Substantially all of TC Treasury's limited operations take place at its offices in the United Kingdom, and substantially no operations take place outside of the United Kingdom.

## I.    <u>The Debtors' Connections to the United States and the Need for Timely Chapter 15 Relief</u>

57.    Though the Debtors have no place of business in the United States, the Indenture under which it issued the Notes is, by its terms, governed by New York law. The Debtors and the Notes Guarantors have expressly consented to the jurisdiction of the Supreme Court of the State of New York, sitting in New York County, the United States District Court of the Southern District of New York, and/or any appellate court from any thereof (each, a "<u>New York Court</u>"). *Id.* § 14.06. The Debtors also have an interest in funds held by Latham & Watkins LLP as a retainer in a New York bank account (the "<u>Bank Account</u>"). Moreover, on information and belief, some of the Noteholders and RCF Lenders are based in the United States.

58.    The Petitioner has been informed that the purpose of seeking recognition in the United States is to ensure the enforceability and effectiveness of the Schemes in the United States.

Furthermore, the Debtors have notified the English Court that it would be seeking chapter 15 recognition of the Scheme, and the English Court is expecting the Debtors to do so.

59.    It is the Petitioner's understanding that the Schemes, once sanctioned, will prohibit Scheme Creditors (the Noteholders, the RCF Lenders and the Trustee for the Notes) from commencing or continuing (or instructing, directing, or authorizing any other person to commence or continue) any Scheme Claim (as defined in the Scheme) after the Scheme Effective Date (which is expected to be September 18, 2019).  The Petitioner has been informed that recognition by this Court of the Schemes is crucial to implementing the Proposed Transaction that will be facilitated by the Schemes because it forecloses the opportunity for dissenting Noteholders or RCF Lenders to attempt to challenge or circumvent the terms of the Schemes.  Absent the relief requested herein, it is the Petitioner's understanding that dissident Noteholders or RCF Lenders in the United States (if any), might attempt to argue that the Scheme are ineffective in the United States and that they therefore have rights under the Indentures or the RCF Agreement to take action against the Debtors, the Joint Obligors, or other parties benefiting from the releases to be effected by the Scheme Amendments.  Although any attempt at enforcement action by a dissenting Noteholder or RCF Lender following sanction of the Schemes by the English Court would be contrary to applicable law and would ultimately be unsuccessful, it could nevertheless impose significant legal costs on the Debtors and other released parties through the need to engage in litigation and could have other adverse impacts.  Thus, the Petitioner respectfully requests that this Court grant the relief requested with all available expediency.

## JURISDICTION AND VENUE

60.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a) and 1334 and the Amended Standing Order of Reference, dated January 31, 2012, Reference M-

431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012)
(Preska, C.J.).

61.     This case has been properly commenced pursuant to section 1504 of the Bankruptcy
Code by the filing of the Petition for recognition of the UK Proceedings under section 1515 of the
Bankruptcy Code.

62.     Venue is proper in this district.  Section 1410 of title 28 of the United States Code
provides as follows:

> A case under chapter 15 of title 11 may be commenced in the district court of the
> United States for the district—
>
> > (1)     in which the debtor has its principal place of business or principal
> > assets in the United States;
> >
> > (2)     if the debtor does not have a place of business or assets in the United
> > States, in which there is pending against the debtor an action or proceeding
> > in a Federal or State court; or
> >
> > (3)     in a case other than those specified in paragraph (1) or (2), in which
> > venue will be consistent with the interests of justice and the convenience of
> > the parties, having regard to the relief sought by the foreign representative.

63.     The Indentures governing the Notes that are the subject of the Schemes are
governed by New York law, and the Debtors' only assets in the United States are located in this
district.

## RELIEF REQUESTED

64.     The Petitioner requests that this Court enter an order, substantially in the form of
the proposed order attached hereto as Exhibit A-1 or, in the alternative, Exhibit A-2, pursuant to
sections 105(a), 362(d), 1507(a), 1509(b)(2)-(3), 1515, 1517, 1521(a), 1521(c), and 1525(a) of the
Bankruptcy Code that:

> (a)     recognizes the UK Proceedings as foreign nonmain proceedings (as defined
> in section 1502 of the Bankruptcy Code), or in the alternative, recognizes

the UK Proceedings as foreign main proceedings (as defined in section 1502 of the Bankruptcy Code);

(b)    recognizes the Petitioner as a "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the UK Proceedings;

(c)    provides that, as of the date hereof, the Scheme Sanction Order and the Scheme are recognized, granted comity, entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and that such terms shall be binding and fully enforceable on all Noteholders and RCF Lenders, whether or not they actually agreed to be bound by the Scheme or participated in the UK Proceedings;

(d)    provides that, if the Court grants recognition as foreign main proceedings, the automatic stay applicable pursuant to section 1520(a)(1) of the Bankruptcy Code is deemed waived and shall be of no force or effect;

(e)    provides that no action taken by the Petitioner in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Schemes, any order entered in respect of the Petition, the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any protections afforded the Petitioner as Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code;

(f)    provides that, for the avoidance of doubt, nothing in the Order shall impair the rights of any entity granted under the Schemes, having regard in particular to the exclusive right of the Courts of England & Wales to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of the Schemes, or out of any action taken or omitted to be taken under the Schemes or in connection with the administration of the Schemes;

(g)    provides that, notwithstanding anything to the contrary provided for therein, nothing in such order shall constitute a finding that the Debtors are insolvent or bankrupt or provide for a moratorium on payment of any debts of the Debtors; *provided* that the foregoing sentence shall not preclude or otherwise modify the rights of the Debtors, the Foreign Representative, or any other party to seek any relief before this Court or otherwise in connection with the Schemes or Chapter 15 Cases;

(h)    provides that this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of any such order issued by this Court; and

(i)     provides such other and further relief as the Court deems proper and just (collectively, the "Relief Requested").

## BASES FOR RELIEF

65.     The Relief Requested is based on the provisions of chapter 15 and certain other provisions of the Bankruptcy Code discussed in detail below.  The purpose of chapter 15 is to "incorporate the Model Law on Cross-Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL") so as to provide effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a). Thus, "[t]he language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law.  Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions."  *In re Pro-Fit Int'l Ltd.*, 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); *see also In re British Am. Ins. Co.*, 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010) ("Chapter 15 represents a nearly verbatim enactment of the Model Law.").  Accordingly, in interpreting chapter 15, a court is to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508.[13]

66.     The Debtors are eligible to be debtors under chapter 15 of the Bankruptcy Code and has property in the United States in this district in accordance with section 109(a) of the Bankruptcy Code.  Specifically, the Debtors have (a) an interest in funds in the Bank Account, *see In re Barnet*, 2014 WL 2805264, at *8 (Bankr. S.D.N.Y. June 19, 2014) (holding cash in client

---

[13]     The legislative history notes that "interpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (the "Guide")] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well."  H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 109-110 (2005).

trust account maintained by the foreign representatives' U.S. counsel satisfied the section 109(a) requirement); *In re Global Ocean Carriers, Ltd.*, 251 B.R. 31, 38-39 (Bankr. D. Del. 2000) (finding that bank accounts constituted property in the United States despite containing minimal funds, and that interest in bankruptcy counsel retainer held in escrow also constituted sufficient property in the United States for Chapter 15 eligibility), and (b) rights under the New York law Indentures, *see In re Berau Capital Res. Pte Ltd*, 540 B.R. 80, 84 (Bankr. S.D.N.Y. 2015) (holding that rights under New York law indenture are qualifying property located in New York). Moreover, the Debtors are entitled to recognition of the UK Proceedings as foreign nonmain proceedings, or in the alternative, as foreign main proceedings, and all of the other relief requested under chapter 15, as outlined below.

A.    **The Court Should Grant Recognition of the UK Proceedings as Foreign Nonmain Proceedings, or in the Alternative, as Foreign Main Proceedings, and of the Petitioner as its Foreign Representative**

67.    Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the court shall enter an order recognizing a foreign proceeding as a foreign nonmain proceeding if (1) such foreign proceeding is a foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.  11 U.S.C. § 1517(a); *see also* H.R. Rep. No. 109-31(I), 109 Cong., Sess. 2005, reprinted in 2005 U.S.C.C.A.N. 88, 169 at 175 (noting, in enacting chapter 15, that the "decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c) of the Bankruptcy Code. The requirements of this section, which incorporates the definitions in section 1502 and sections 101(23) and (24), are all that must be fulfilled to attain recognition").  While the foreign representative has the burden of establishing recognition, a decision or certificate of a foreign court recognizing the foreign proceeding or

38

foreign representative creates a rebuttable presumption that the foreign proceeding and foreign representative can be recognized. *See In re Overnight & Control Comm'n of Avanzit, S.A.*, 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008). As explained below, the UK Proceedings, the Petitioner, and this Petition satisfy all of the foregoing requirements.

(i)    <b>The UK Proceedings are Foreign Nonmain Proceedings</b>

68.    The UK Proceedings are foreign nonmain proceedings and, as such, satisfy the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

69.    As an initial matter, the UK Proceedings come within the general definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code.[14]  Section 101(23) requires that a "foreign proceeding" (1) be a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court, and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor.[15]  *See* 11 U.S.C. § 101(23).  The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."  *See* 11 U.S.C. § 1502(3).

70.    There should be little doubt that the UK Proceedings qualify as "foreign proceedings" under section 101(23).  Section 1516(a) of the Bankruptcy Code entitles this Court to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so indicates.  *See* 11 U.S.C. §§ 1516(a), 1515(b)(1).  Here, the English Court

---

[14]    Section 101(23) of the Bankruptcy Code provides that "[t]he term 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."  11 U.S.C. § 101(23).

[15]    The Schemes are not for this purpose which is to make amendments to facilitate the Proposed Transaction.

has recognized that "the Court [is] satisfied that it has jurisdiction in relation to the Scheme."

Fankhauser Declaration, Exhibits A-1, A-2, and A-3, at Recitals.  Further, the English Court

ordered that Peter Fankhauser is "appointed foreign representative authorised . . . to act as a foreign

representative . . . in any Chapter 15 proceedings in the United States Bankruptcy Court".  *See*

Fankhauser Declaration, Exhibit A-1 at ¶ 21, Exhibit A-2 at ¶ 21, and Exhibit A-3 at ¶ 22.  The

English Court presupposed that the UK Proceedings are of the kind encompassed by the section

101(23) definition of "foreign proceeding," which is based on the definition set forth in Article

2(a) of the Model Law (adopted by the United Kingdom); otherwise it would not have authorized

the Petitioner to file this Chapter 15 Case.

71.     The UK Proceedings are "collective" because it directly involves all Noteholders

and RCF Lenders and requires approval by a majority in number of the voting Scheme Creditors

representing at least three-quarters in amount of the claims voted at the relevant Scheme Meetings

in order for the Schemes to proceed.  The Schemes are intended to benefit all Scheme Creditors

collectively, rather than to benefit any single Scheme Creditor.

72.     The UK Proceedings are judicial proceedings in that they required the Convening

Court Orders to commence and will require the Scheme Sanction Order for the Schemes to be

ultimately approved, each issued by the English Court, a judicial body of the United Kingdom,

which, under the Schemes, will have exclusive jurisdiction to hear and determine any suit, action,

or Proceeding (as defined in the Schemes) and to settle any dispute which arises out of or in

connection with the terms of the Schemes or its implementation or out of any action taken or

omitted to be taken under the Schemes or in connection with the administration of the Scheme and

for such purposes the Scheme Creditors irrevocably submitted to the jurisdiction of the English

Court.  Fankhauser Declaration, Exhibit B, Part 13 at ¶ 12.1.  Thus, the English Court will supervise the affairs of the Debtors in connection with the Schemes.

73.    The UK Proceedings are pending in a foreign country, England (a constituent member of the political union comprising the United Kingdom), under a law relating to adjustment of debt (*i.e.*, Part 26 of the Companies Act 2006), for the purpose of reorganization.  The Schemes proposed in this case effect certain amendments to the Notes Indentures and the RCF Agreement which will facilitate the implementation of the Proposed Transaction and are therefore proceedings under a law that is for the "adjustment of debt."  At its eighteenth session, the UNCITRAL Working Group on Insolvency Law, which oversaw the drafting of the Model Law, indicated that the term "foreign proceeding" was meant to include scheme and composition proceedings such as the UK Proceedings:

> The proposal was made to add to [the definition of "foreign proceeding"] a reference to composition proceedings, namely, *proceedings in which indebtedness was reduced while the debtor remained in control of its assets*.  The Working Group hesitated to add such a specific reference to composition proceedings.  One view in that direction was that the broad category of "reorganization", which might be read more as an economic than as a legal term, would widely be understood as encompassing composition and other such proceedings.  It was felt that adding such a specific reference to any particular form of reorganization might actually create uncertainty.  Furthermore, it was observed that attempting a list of reorganization proceedings would run the risk of excluding some types of proceedings intended to be covered.  *While it was generally agreed that composition proceedings should be covered*, the Working Group was not ready to reach a definitive decision on how best to achieve that result and deferred consideration of the matter to a later stage of its work.

U.N. G.A., United Nations Comm'n on Int'l Trade L., 29th Sess., Rep. of Working Grp. on Insolvency Law on the Work of the Eighteenth Sess. ¶ 108 (December 1, 1995) ("<u>A/CN.9/419</u>") (emphasis added).

74.      The Bankruptcy Code definition of "foreign proceeding" is even clearer in that it

adds the phrase "or adjustment of debt" to the words "under a law related to insolvency."   11

U.S.C. § 101(23).  The legislative history indicates that the change is to emphasize "that the scope

of the Model Law and chapter 15 is not limited to proceedings involving only debtors which are

technically insolvent, but broadly includes all proceedings involving debtors in severe financial

distress, so long as those proceedings also meet the other criteria of section 101(24) [sic]."   H.

Rep. 109-31, Pt. 1, 109th Cong., 1st Sess. 118 (2005).

75.      Accordingly, schemes under English law have routinely been recognized as foreign

proceedings in chapter 15 cases by this Court.  *See, e.g., In re Stripes US Holding, Inc.,* No. 18-

12388-CSS (Bankr. D. Del. Oct. 24, 2018), *In re Bibby Offshore Services Plc*, No. 17-13588

(Bankr. S.D.N.Y. January 1, 2018); *In re Metinvest B.V.*, No. 17-10130-LSS (Bankr. D. Del. Feb.

8, 2017); *In re DTK Finance (plc)*, No. 16-13521-shl (Bankr. S.D.N.Y. Jan. 18, 2017);  *In re

Metinvest B.V.*, No. 16-11424-LSS (Bankr. D. Del. Jun. 30, 2016); *In re Abengoa Concessions

Investments Limited*, No. 16-12590-kjc (Bankr. D. Del. Dec. 6, 2016);  *In re YH Limited*, No. 16-

12262 (Bankr. S.D.N.Y. Sep. 8, 2016); *In re Metinvest B.V.*, No. 16-10105-LSS (Bankr. D. Del.

Jan. 29, 2016); *In re OIC Run-Off Limited*, No. 15-13054-scc (Bankr. S.D.N.Y. Jan. 11, 2016); *In

re Codere Finance (UK) Limited*, No. 15-13017-jig (Bankr. S.D.N.Y. Dec. 22, 2015);  *In re

Towergate Finance, plc,* Case No. 15-10509 (SMB) (Bankr. S.D.N.Y. Mar. 27, 2015); *In re New

World Resources N.V.*, Case No. 14-12226 (SMB) (Bankr. S.D.N.Y. Sept. 9, 2014); *In re Zlomrex

International Finance S.A.*, No. 13-14138 (Bankr. S.D.N.Y. Jan. 31, 2014); *In re Magyar Telecom

B.V.*, No 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013); *In re Tokio Marine Europe Insurance Ltd.*,

No. 11-13420 (MG) (Bankr. S.D.N.Y. Sept. 08, 2011); *Highlands Ins. Co.* (U.K.), No. 07-13970

(MG) (Bankr. S.D.N.Y. Aug. 18, 2009); *In re Castle Holdco 4, Ltd.*, No. 09-11761 (REG) (Bankr. S.D.N.Y. May 7, 2009).

76.    Having established that the UK Proceedings are foreign proceedings within the meaning of section 101(23) of the Bankruptcy Code, the UK Proceedings should be recognized as a foreign nonmain proceeding because they satisfy the requirements of section 1517(b)(2) of the Bankruptcy Code, which provides that "[a] foreign proceeding shall be recognized . . . as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending".  Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out nontransitory economic activity." 11 U.S.C. § 1502(2).  The legislative history of chapter 15 suggests that an "establishment" represents the bare minimum presence that a debtor must demonstrate in the applicable jurisdiction to obtain chapter 15 recognition of a foreign proceeding.  *See* H. Rep. 109-31, Pt. 1, 109th Cong., 1st Sess. 107 (2005) ("In order to be recognized as a foreign nonmain proceeding, the debtor must *at least* have an establishment in that foreign country.") (emphasis added).

77.    To satisfy this definition, a debtor must have "a seat for local business activity" in the foreign country and this activity must have a "local effect on the marketplace." *In re Mood Media Corp.*, 569 B.R. 556, 561 (Bankr. S.D.N.Y. 2017). Thus, courts have recognized establishments in jurisdictions in which debtors conducted limited business activities and maintained certain records and where members of its board of directors were located. *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 85 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012); *see also In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 915-16 (Bankr. S.D. Fla. 2010). Courts also consider the following factors that "contribute to identifying

an establishment: the economic impact of the debtor's operations on the market, the maintenance

of a 'minimum level of organization' for a period of time, and the objective appearance to creditors

whether the debtor has a local presence." *In re Millennium Glob. Emerging Credit Master Fund*

*Ltd.*, 458 B.R. at 85.

78.     The Debtors' business activities in the United Kingdom more than satisfy this

standard: First, the Debtors' registered offices are in London, United Kingdom (in the case of

TCG) and Peterborough, United Kingdom (in the case of TCF2 and TC Treasury).  Second, the

Debtors' primary place of business is in London, United Kingdom, where the Debtors store their

statutory books, records, and corporate documents.  Third, the Debtors pay taxes in the United

Kingdom.

79.     In addition to qualifying as "foreign nonmain proceedings" under section 1502, the

UK Proceedings qualify as "foreign main proceedings," which is defined in the Bankruptcy Code

as "a foreign proceeding pending in the country where the debtor has the center of its main

interests." See 11 U.S.C. § 1502(4); see also 11 U.S.C. § 1517(b)(1) (providing that an order of

recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject

to the petition "is pending in the country where the debtor has the center of its main interests").

The Bankruptcy Code neither defines nor provides a conclusive test for determining the location

of a debtor's "center of its main interests" ("COMI").  It does provide, however, that "in absence

of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an

individual, is presumed to be the center of the debtor's main interests." 11 U.S.C. §1516(c).  Based

on the evidence before the Court reflected in the Frankhauser Declaration and the statutory

presumption in favor of COMI pursuant to section 1516(c) of the Bankruptcy Code, each of the

Debtors has COMI, in addition to an establishment, in the United Kingdom.

80.    Section 1517(b) provides that "[a] foreign proceeding *shall be recognized*--(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; *or* (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending."  11 U.S.C. § 1517(b) (emphasis added).  Accordingly, recognition of a foreign proceeding is mandatory where either prong of section 1517(b) is satisfied.  The Bankruptcy Code does not dictate, however, on what form recognition must take where—as in the present case—the debtors have *both* "COMI" and an "establishment" in the jurisdiction where the foreign proceedings are taking place.  In these circumstances, to avoid the absurd result of interpreting section 1517(b) of the Bankrutpcy Code to require recognition of the UK Proceedings as both main *and* nonmain proceedings based on the existence of both COMI and establishments in the United Kingdom, the Court should interpret section 1517(b) as providing a disjunctive list of alternatives among which it may select in its discretion to fashion relief that facilitates the purposes of chapter 15.[16]  *See* ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) at 116 ("Under the conjunctive/disjunctive canon, *and* combines items while *or* creates alternatives.").  The Petitioner respectfully requests that the Court exercise such discretion to recognize the UK Proceedings as foreign nonmain proceedings in furtherance of the purposes of chapter 15 to protect and maximize the value of the Debtors' assets and to facilitate the rescue of financially troubled businesses, thereby protecting investment and preserving employment. *See* 11 U.S.C. § 1501(a).

81.    In the alternative, if the Court determines instead that the UK Proceedings must be recognized as foreign main proceedings, the Petitioner requests that any such recognition be

---

[16]    The Petitioner acknowledges that the definition of "foreign nonmain proceedings" set forth in section 1502 excludes a foreign main proceeding.  *See* 11 U.S.C. §1502(5) ("[F]oreign nonmain proceeding" means a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment.").

45

granted together with a general waiver of the automatic stay (the "Stay Waiver").  The Court is authorized to grant the Stay Waiver pursuant to sections 105(a) and 362(d) of the Bankruptcy Code.  Section 362(d)(1) of the Bankruptcy Code provides that the Court may grant relief from the automatic stay "for cause", which is not defined under the Bankruptcy Code.  In this case, cause exists to grant general relief from the automatic stay based on the request of the Debtors' business judgment that application of the automatic stay may be harmful to the Debtors and their stakeholders and may not provide any cognizable benefits to the Debtors or their stakeholders. *See*, *e.g.*, *In re Triple A & R Capital Inv., Inc.*, 519 B.R. 581, 584 (Bankr. D.P.R. 2014) (enforcing debtor's prepetition agreement to waive the automatic stay and finding that the debtor's waiver of the stay is a factor in favor of finding cause exists to grant relief from the stay).

82.    Notwithstanding anything to the contrary herein or in any other document filed by the Petitioner in these Chapter 15 Cases, the Petitioner is not requesting main recognition of the UK Proceedings absent the Court's approval of the Stay Waiver.  As noted in paragraph 8 of this Petition, such relief may be asserted to trigger certain events of default under the Indentures as well as subsequent cross-defaults under the Debtors' other debt instruments, including the RCF Agreement, and/or other agreements.  To that end, the Petitioner respectfully requests that, if the UK Proceedings are not to be recognized as foreign nonmain proceedings, the Court instead either (a) recognize the UK Proceedings as foreign main proceedings and grant the Stay Waiver or (b) reserve decision on the form of recognition of the UK Proceedings until the Debtors may consider any rulings and guidance provided by the Court.

> (ii)    **Failure to Obtain Recognition of the UK Proceedings as Foreign Nonmain Proceedings or Foreign Main Proceedings Would Cause Significant Harm to the Debtors' Businesses**

83.    The Petitioner has been informed that the English Court must find that the Schemes are likely to be recognized and enforced in the other jurisdictions in which the Debtors have assets.

The Petitioner seeks recognition of the UK Proceedings as foreign nonmain proceedings (or in the alternative as foreign main proceedings) because the Debtors do not require at this stage the relief, such as the imposition of the automatic stay within the United States, that would apply upon recognition of the UK Proceedings as a foreign main proceeding under section 1520 of the Bankruptcy Code.  In addition, recognition of a main proceeding and application of the automatic stay in the United States could give rise to adverse consequences that may impact the Debtors' legal rights, including the potential event of default triggers mentioned in paragraphs 8 and 82 hereof.  Although the Debtors may dispute such impacts, the Debtors' restructuring options could become constrained in a manner that could become detrimental to the Debtors and their stakeholders.

84.    Specifically, if the UK Proceedings are recognized as foreign main proceedings (together with the application of the automatic stay within the territorial jurisdiction of the United States pursuant to section 1520(a)(1) of the Bankruptcy Code), such relief may be asserted to trigger certain events of default under the Indentures as well as subsequent cross-defaults under the Debtors' other debt instruments, including the RCF Agreement, and/or other agreements.  Such actions by other parties could have significant adverse effects on the Debtors' ability to maximize the value of their assets as well as their ability to obtain third-party financing that may be necessary to preserve the more than 21,000 jobs provided by the Debtors' businesses.  In addition, the automatic stay limited to the territorial jurisdiction of the United States (which would be triggered upon main recognition absent the Stay Waiver) may not provide the Debtors with meaningful protection because their assets and operations are primarily outside of the United States.  In light of the foregoing considerations, the requested relief is entirely consistent with the purpose and scope of chapter 15.  *See In re Barnet*, 737 F.3d  238, 250-51 (2nd Cir. 2013) (citing 11 U.S.C. §

1501(a)) ("Chapter 15 contains an express purpose section that states: 'The purpose of this chapter is to incorporate the Model Law on Cross–Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of": (1) international cooperation; (2) 'greater legal certainty for trade and investment'; (3) 'fair and efficient administration of cross-border insolvencies'; (4) 'protection and maximization of the value of the debtor's assets; and (5) facilitation of the rescue of financially troubled businesses.").

85.     For all of the reasons set forth above, the UK Proceedings are, and should be recognized as, foreign nonmain proceedings in respect of the Debtors.  In the alternative, the UK Proceedings should be recognized as foreign main proceedings in respect of the Debtors, and the Court should waive the application of the automatic stay in the territorial jurisdiction that would otherwise apply pursuant to section 1520(a)(1) of the Bankruptcy Code upon recognition of foreign main proceedings.

(iii)     **The Petitioner Meets the Requirements of a Foreign Representative**

86.     The second requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a person or body.  *See* 11 U.S.C. § 1517(a)(2).

87.     The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).  Under section 101(41) of the Bankruptcy Code, the "term 'person' includes [an] individual[.]"  11 U.S.C. § 101(41).

88.    The Petitioner in this case is an individual who has been (1) duly appointed by the Debtors' board as foreign representative of the UK Proceedings and (2) declared as authorized to act as "foreign representative" pursuant to the Convening Court Orders.  Fankhauser Declaration, Exhibit A-1 at ¶ 21, Exhibit A-2 at ¶ 21, and Exhibit A-3 at ¶ 22.  As such, the Petitioner satisfies the second requirement for the entry of an order recognizing the UK Proceedings under section 1517(a) of the Bankruptcy Code.

(iv)    **The Petition Meets the Requirements of Section 1515**

89.    The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. § 1517(a)(3).  Section 1515 of the Bankruptcy Code sets forth the following:

(a)    A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b)    A petition for recognition shall be accompanied by—

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c)    A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d)    The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

90.     Here, all of the requirements have been met.  First, the Chapter 15 Case was duly
and properly commenced by the Petitioner through the filing of this Petition as required by section
1515(a) of the Bankruptcy Code.

91.     Second, evidence of the existence of the UK Proceedings and the appointment of
the Petitioner as foreign representative thereof have been provided to the Court as required under
section 1515(b)(1) and (d) of the Bankruptcy Code.  *See* Fankhauser Declaration, Exhibits A-1,
A-2, and A-3.

92.     Third, in accordance with section 1515(c) of the Bankruptcy Code, the attachment
to the Petition contains a statement identifying the UK Proceedings as the only foreign proceedings
currently pending with respect to the Debtors.

93.     For all of the reasons set forth above, the Petitioner respectfully submits that all of
the requirements of section 1517(a) have been satisfied and, thus, that the entry of an order
recognizing the UK Proceedings as foreign nonmain proceedings is proper.

**B.**     **The Discretionary Relief Requested Is Necessary and Appropriate to Effect the
Schemes and the Proposed Transaction and Should Be Granted**

94.     Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to
grant "any appropriate relief" at the request of the recognized foreign representative "where
necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the
interests of the creditors."  11 U.S.C. § 1521(a).  The Court may grant relief under section 1521(a)
if the interests of "the creditors and other interested entities, including the debtor, are sufficiently
protected."  11 U.S.C. § 1522(a).

95.     In granting discretionary relief, the court may also act pursuant to section 1507 to
provide "additional assistance" to a foreign representative under the Bankruptcy Code or other
U.S. law.  *See* 11 U.S.C. § 1507(a).  The legislative history to section 1507 states that the section

provides authority for "additional relief" beyond that permitted under sections 1519 to 1521.  *See*

H.R. Rep. No. 109-31, pt. I, 109th Cong., 1st Sess. 109 (2005).  In exercising discretion to grant

relief under section 1507, courts will be guided by the standards set forth in section 1507.  Section

1507(b) provides that:

> In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—
>
> > (1)    just treatment of all holders of claims against or interests in the debtor's property;
> >
> > (2)    protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
> >
> > (3)    prevention of preferential or fraudulent dispositions of property of the debtor;
> >
> > (4)    distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
> >
> > (5)    if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

96.    Additionally, section 105(a) of the Bankruptcy Code provides that the "court may

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title."  11 U.S.C. § 105(a).

97.    As described above, the purpose of chapter 15 is to incorporate the Model Law into

the United States bankruptcy law.  Chapter 15 is designed to provide effective mechanisms for

dealing with cross-border insolvency cases with the objectives of:

> (1)    cooperation between—
>
> > (A)    courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and
> >
> > (B)    the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

(2)    greater legal certainty for trade and investment;

(3)    fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4)    protection and maximization of the value of the debtor's assets; and

(5)    facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501(a).  "Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee."  11 U.S.C. § 1525(a); *see also* 11 U.S.C. § 1509(b)(3) (once recognition of a foreign proceeding is granted, "a court in the United States shall grant comity or cooperation to the foreign representative");[17] *In re Toft*, 453 B.R. 186, 190 (Bankr. S.D.N.Y. 2011) (quoting section 1509).

98.    For the reasons that follow, the Petitioner requests this Court to exercise its discretion under sections 105, 1507, and 1521 to grant the remaining Relief Requested.

(i)    **The Discretionary Relief Requested Is Appropriate under Section 1521**

99.    The remaining portion of the Relief Requested is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code.  If granted, such relief would promote all of the legislatively enumerated objectives of section 1501(a).

100.    Fair and efficient administration of the Restructuring requires that all Scheme Creditors be bound by the terms of the Schemes as approved and made effective by the English Court and the laws of England and Wales.  *See Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign proceeding enables the assets

---

[17]    The term "cooperation" appears to be even broader than the term "comity."  *See Ad Hoc Grp. of Vitro Noteholders v. Vitro SAB de CV (In re Vitro SAB de CV)*, 701 F.3d 1031, 1047 (5th Cir. 2012 ), *cert. denied sub nom. Vitro, S.A.B. de C.V. v. Ad Hoc Group of Vitro Noteholders*, 133 S.Ct. 1862 (2013) (Mem) ("Although use of the word 'comity' connotes recognition of another judicial proceeding, the word 'cooperation' suggests a much broader meaning.").

of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion."). Indeed, the Supreme Court recognized the necessity of giving effect to foreign schemes of arrangement in order to further these goals, reasoning that:

> [u]nless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.

*Canada S. Ry. Co. v. Gebhard*, 109 U S. 527, 539 (1883) (giving effect to a Canadian scheme of arrangement).

> (ii)    **Granting the Discretionary Relief Requested Will Leave Creditors and Other Parties in Interest "Sufficiently Protected" and Will Not Be "Manifestly Contrary to the Public Policy of the United States"**

101.    The Relief Requested under section 1521 is designed to promote the goals of chapter 15. *See* 11 U.S.C. § 1525(a) ("Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee."). As shown above, such relief is "appropriate" as that term is used in section 1521 because it is necessary to ensure the success of the UK Proceedings, the Schemes, and the Proposed Transaction. However, the Court may grant such relief only if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (adopting Article 22 of the Model Law).

102.    The Bankruptcy Code does not define "sufficient protection." The legislative history indicates that the prohibition was meant to apply "if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors." H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 116 (2005). A determination of sufficient protection "requires a balancing of the respective parties' interests." *In re AJW Offshore, Ltd.*, 488 B.R. 551, 559 (Bankr. E.D.N.Y.

2013); *see also Tri-Cont'l Exch.*, 349 B.R. at 637 ("Standards that inform the analysis of § 1522 protective measures in connection with discretionary relief emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another."); Guide ¶ 161 ("The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief. This balance is essential to achieve the objectives of cross-border insolvency legislation."). Section 1522 "gives the bankruptcy court broad latitude to mold relief to meet specific circumstances." *Int'l Banking*, 439 B.R. at 626-27 (internal quotations and citations omitted); *Atlas Shipping*, 404 B.R. at 740; *see also In re Artimm*, 278 B.R. 832, 837 (Bankr. C.D. Cal. 2002) (Section 304 "discretion typically points in favor of granting relief to section 304 petitioners," and "section 304 gives a court wide latitude to mold appropriate relief so that a foreign insolvency can proceed in a rational fashion with due regard for all of the varied and competing interests at issue.").

103.    All Scheme Creditors are "sufficiently protected" by the treatment afforded them by the Schemes and the process by which it will be approved because all Scheme Creditors located in the United States are not subject to undue inconvenience or prejudice and will be treated differently to the other Scheme Creditors. Further, the Relief Requested would assist in the efficient administration of this cross-border transaction, and it would not harm the interests of the debtors or their creditors." *In re Grant Forest Prods., Inc.*, 440 B.R. 616, 621 (Bankr. D. Del. 2010).

104.    A court may also deny a request for any chapter 15 relief that would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The legislative history

indicates that the "public policy" exception is narrow, applying only to the "most fundamental policies of the United States."  H. Rep. No. 109-31, pt. 1, 109th Cong., 1st Sess. 109 (2005); *see also Fairfield Sentry*, 714 F.3d at 138 ("The statutory wording requires a narrow reading."); *Vitro*, 701 F.3d at 1069; *Oilsands Quest*, 484 B.R. at 597.  One court has determined, for example, that the lack of an opportunity for a jury trial is not manifestly contrary to U.S. public policy.  *See In re Ephedra Prod. Liab. Litis.,* 349 B.R. 333, 335-36 (S.D.N.Y. 2006).

105.    Accordingly, it is not necessary that the result achieved in the UK Proceedings be identical to that which would be had in the United States.  It is sufficient if the result is "comparable" or "similar."  *Vitro*, 701 F.3d at 1044 (citing cases); *Sino-Forest*, 501 B.R. at 665 (quoting *Metcalfe*); *Metcalfe*, 421 B.R. at 697.  Furthermore, the mere fact that a foreign representative requests relief that would be available under the law of the foreign proceeding, but not in the United States, is not alone grounds for denying comity.  *See In re Condor Ltd.*, 601 F.3d 319, 327 (5th Cir. 2010).

106.    The Debtors' connections to the United Kingdom described above also lead to the conclusion under United States and international norms that the English Court's exercise of jurisdiction to adjudicate was proper.  *See Restatement of the Law (Third), Foreign Relations Law of the United States* § 421 (1987) (setting forth "reasonableness" standard for exercise of jurisdiction to adjudicate and citing, *inter alia*, presence, regular conduct of business, and consent to jurisdiction as indicators of reasonable exercise of such jurisdiction by a particular country's courts over a company).

107.    Regarding procedural fairness, the Petitioner submits that the steps undertaken and to be undertaken before the Schemes can become effective ensure due process such that this Court should grant comity to the Scheme Sanction Order (if issued and duly lodged with the Registrar

of Companies) and recognize and enforce the Schemes. This Court should take comfort in the fact that the Schemes will have been approved by an English court under the laws of England and Wales. *See Hopewell*, 238 B.R. at 66 ("[W]hen the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings.") (internal quotation marks and citations omitted); *see also Sino-Forest*, 501 B.R. at 663 (citing *Metcalfe* for a similar proposition).

108.    Second, the specific steps followed and to be followed in the UK Proceedings demonstrate adequate process. Notice of the application to convene creditors' meetings (*i.e.*, the Scheme Meetings) and the hearing thereon was delivered to all Noteholders and RCF Lenders pursuant to the Practice Statement Letter on August 28, 2019, by (i) postings on the Scheme Website and (ii) delivery to Noteholders through the Clearing Systems and to the RCF Lenders via GLAS. The formal notice period is reasonable. The English Court has ordered that the Information Package (i) be published on the Scheme Website and that notice be given to the Noteholders via the Clearing Systems and to the RCF Lenders via GLAS (ii) be made available for inspection during normal business hours at the offices of GLAS, 45 Ludgate Hill, London EC4M 7JU, UK. The Information Package includes, among other things, (a) the Explanatory Statement, (b) the Scheme, (c) a Notice of the Scheme Meeting, and (d) voting instructions.

109.    Each of the Scheme Creditors has the opportunity to attend the Scheme Meeting, ask questions, and raise concerns in respect of the Schemes, and ultimately to vote against it in person or by proxy if it believes the Schemes not to be in the best interests of the Scheme Creditors.

110.    As noted above, in order for the Schemes to become binding, it must also be approved by the English Court following the Scheme Meetings (assuming the requisite majorities

of Scheme Creditors vote in favor of the Schemes) at the Sanction Hearing. All Scheme Creditors

will have another opportunity to raise objections to the Schemes and to submit and examine

evidence at the Sanction Hearing. Additional safeguards of due process include:

- If the English Court approves the Schemes, the Scheme Sanction Order will be appealable by Scheme Creditors, subject to permission granted by the English Court or, as the case may be, the Court of Appeal itself.

- United States and other non-English creditors have the same rights to participate in the UK Proceedings as English creditors.

- The procedures followed and to be followed regarding notice, information, voting, and opportunity to object and present evidence in the UK Proceedings are similar to those employed in chapter 11 cases in the United States.

111.    In addition to the matters set forth above, the Schemes have the following features

that ensure the fairness of the Schemes:

    (a)    acceptance of the Schemes requires seventy-five percent in value and a majority in number of the Scheme Creditors that cast a vote at the relevant Scheme Meetings; and

    (b)    all Scheme Creditors are receiving the same treatment in accordance with the Schemes and as described in Section G (*Implementation of the Amendments*) above.

112.    Accordingly, the Petitioner submits that the standards required to "sufficiently

protect" creditors and other parties in interest have been met, that grant of the Requested Relief

would not be manifestly contrary to the public policy of the United States, and that the Requested

Relief can and should therefore be granted.

    (iii)    **Granting the Discretionary Relief Requested Meets the Traditional Standards of "Comity" Under Section 1507(b)**

113.    While satisfaction of the standards set forth in sections 1521 and 1522 is sufficient

to grant the discretionary portions of Relief Requested, to the extent the Court holds that section

1507(a) is a necessary predicate to granting such relief, the Petitioner submits that granting the

Relief Requested meets the standards of comity set forth under section 1507(b) of the Bankruptcy Code.

114.    The first factor under section 1507(b) is whether the additional assistance contemplated will reasonably assure "just treatment of all holders of claims against or interests in the debtor's property."  The Schemes provide for certain amendments to be made to the Indentures and the RCF Agreement and the Scheme Creditors' other claims are not impaired by the Schemes. Just treatment of the Scheme Creditors is protected, in part, by the higher voting threshold to approve the Schemes, versus a plan of reorganization in the chapter 11 context.

115.    The second enumerated factor, "protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding," 11 U.S.C. § 1507(b)(2), is satisfied where creditors are given adequate notice of timing and procedures for filing claims, and such procedure does not create any additional burdens for a foreign creditor to file a claim.  *See, e.g., Treco*, 240 F.3d at 158; *In re Petition of Hourani*, 180 B.R. 58, 68 (Bankr. S.D.N.Y. 1995).  Given the fact that the Debtors do not have a comprehensive schedule of the identities of the Scheme Creditors, it has taken measures reasonably calculated to effect adequate notice by delivering notice of the Schemes, the Scheme Meetings, and other relevant documents and deadlines, to the relevant depositaries through the Information Agent for distribution to Account Holders and on to the Noteholders through the Clearing Systems and to the RCF Lenders via GLAS.

116.    Section 1507(b)(3) requires that the "additional assistance" being considered will reasonably assure prevention of preferential or fraudulent dispositions of property of the Debtor. This consideration has little relevance here as the Schemes merely effect certain amendments to the Indentures and the RCF Agreement none of which seek to permit any transaction which might

be a preferential or fraudulent disposition.  Any trade and other creditors are not affected by the

Scheme and retain their rights

117.    Section 1507(b)(4) requires that the distribution of the Debtors' property

substantially comply with the order of distribution available under the Bankruptcy Code.  *See, e.g.,*

*In re Gee*, 53 B.R. at 904; *see also Haarhuis v. Kunnan Enters., Ltd.*, 177 F.3d 1007 (D.C. Cir.

1999) (finding that the Taiwanese distribution system was substantially in accordance with U.S.

law because priority afforded to certain classes of claims as under the Bankruptcy Code).  Simply

put, section 1507(b)(4) merely requires that the "foreign distribution scheme be 'substantially in

accordance' with United States bankruptcy law; it does not have to mirror the United States

distribution rules."  *In re Ionica*, 241 B.R. 829, 836 (Bankr. S.D.N.Y. 1999) (citations omitted).

Although the Schemes do not effect any distribution of the Debtors' property, the Proposed

Transaction contemplated by the Schemes respects priority both in terms of right of payment and

in distribution of proceeds in the Debtors' property in substantially the same way it is respected

under the Bankruptcy Code as all Scheme Creditors are being treated equally.

118.    Section 1507 of the Bankruptcy Code requires that any determination of a request

for assistance under chapter 15 be "consistent with principles of comity[.]"  11 U.S.C. § 1507.  As

the House Judiciary Committee noted in its report, "comity is raised to the introductory language

to make clear that it is the central concept to be addressed."  H. Rep. at 109, U.S. Code Cong. &

Admin. News 2005, 88, 172; *see also* 11 U.S.C. § 1509(b)(3) (once recognition of a foreign

proceeding is granted, the court in the United States shall grant comity or cooperation to the foreign

representative).

119.    Principles of comity support the grant of the relief requested herein.  Federal courts

generally extend comity "whenever the foreign court had proper jurisdiction and enforcement does

not prejudice the rights of United States citizens or violate domestic public policy." *See Victrix*, 825 F.2d at 713 (citing *Hilton v. Guyot*, 159 U.S. 113, 202-03, 16 S. Ct. 139, 40 L. Ed. 95 (1895)); *see also Cunard*, 773 F.2d at 456-57; *Atlas Shipping*, 404 B.R. at 733. As noted above, particularly in the bankruptcy context, "American courts have long recognized the need to extend comity to foreign bankruptcy proceedings," because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Victrix*, 825 F.2d at 713-14. Other courts have similarly underscored the importance of extending comity to foreign bankruptcy proceedings. *See, e.g., Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d. Cir. 1999); *Maxwell Commc'ns Corp. v. Societe Generate (In re Maxwell Commc'ns Corp.)*, 93 F.3d 1036, 1048 (2d Cir. 1996); *Cunard*, 773 F.2d at 458; *Oui Fin.*, 2013 WL 5568732, at *5 (comity under New York law should normally be extended to foreign restructuring proceedings if the foreign court is of competent jurisdiction, and the proceedings are procedurally fair and do not contravene public policy). Indeed, comity should be withheld only when the recognition of foreign proceedings would be adverse to the public policy interests of the United States. *See Somportex, Ltd. v. Philadelphia Chewing Gum Corp.*, 453 F.2d 435, 440 (3rd Cir. 1971); *Cunard*, 773 F.2d at 457 (citing *Somportex*). As discussed above, because the Schemes are not contrary or prejudicial to the interests of creditors in the United States, the doctrine of comity supports the granting of permanent relief enforcing the Schemes under both section 1507 and section 1521 of the Bankruptcy Code in this case.

120.    Accordingly, the Requested Relief should be granted.

## NOTICE

121.   Notice of this Petition has been provided to (i) the Debtors, (ii) counsel to the Debtors, (iii) counsel to the Trustee, (iv) counsel to the RCF Agent, (v) the Information Agent, (vi) the Office of the United States Trustee for the Southern District of New York and (vii) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware.  Furthermore, notice of the intention to commence this case was given to the Scheme Creditors in the Practice Statement Letter, which was disseminated in the manner described above. The Petitioner submits that no other or further notice need be provided.

## NO PRIOR REQUEST

122.   No previous request for the relief requested herein has been made to this or any other court.

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order (i) granting the Relief Requested herein and (ii) granting the Petitioner and Debtors such other and further relief as the Court deems proper and just.

Dated: September 16, 2019
        New York, New York

LATHAM & WATKINS LLP

*/s/ Adam J. Goldberg*

Adam J. Goldberg
Shaun C. Lee
885 Third Avenue
New York, NY 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Counsel to the Foreign Representative*

## VERIFICATION

Dr. Peter Fankhauser hereby declares:

1.    I have been appointed Foreign Representative, pursuant to 28 U.S.C. § 1746, by the board of directors of Thomas Cook Group plc, Thomas Cook Group Treasury Limited and Thomas Cook Finance 2 plc and have been declared by the Chancery Division (Business and Property Court) of the High Court of Justice of England and Wales as authorized to commence and act in this ancillary case.

2.    I have read this Verification and the foregoing Petition and I am informed and believe that the factual allegations contained therein are true and correct.

3.    I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:    September 16, 2019
200 Aldersgate, London,
EC1A 4HD, United Kingdom

_____
Dr. Peter Fankhauser